**In re BELL FUEL CORPORATION.**

**MERIDIAN BANK, Plaintiff,**

v.

**BELL FUEL CORP., et al., Defendants.**

**Civ. A. Nos. 89–2329, 89–2674.**

United States District Court,
E.D. Pennsylvania.

May 4, 1989.

Robert A. Kargen, Richard Kwasny, Lesser & Kaplin, P.C., Blue Bell, Pa.,

Charles M. McCuen, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for Official Creditors' Committee of Bell Fuel Corp.

Marvin Krasny, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for debtor Bell Fuel Corp.

## OPINION AND ORDER

VanARTSDALEN, Senior District Judge.

### Introduction

Meridian Bank (Meridian) appeals from the decision of Bankruptcy Judge Scholl in which the bankruptcy court concluded Meridian did not have a perfected security interest in the proceeds of a chose in action, 97 B.R. 193 (1989).

The debtor, Bell Fuel Corporation (Bell) signed a security agreement with Meridian Bank on February 25, 1985. The security agreement was signed in connection with a Line and Term Loan Agreement to secure payment of sums lent to Bell by Meridian. The security agreement in pertinent part states:

> Part 6: "Collateral" as used in this Security Agreement refers to the types of property initiated by the Borrower and checked below:
>
> (x) ACCOUNTS: Meaning all of [the Debtor's] present and future accounts, contracts, chattel paper, instruments and documents, and all other rights to the payment of money, including but not limited to any Specific Property described below, whether or not yet earned, for services rendered or goods sold, consigned, leased or furnished by the Borrower, *together with all general intangibles, guarantees and securities relating to any of the foregoing,* and all returned, reclaimed or repossessed goods the sale, consignment, lease or other furnishing of which shall have given or may give rise to any of the foregoing, including, without limitation, the right of stoppage in transit.

(emphasis added).

The parties agree that the Bank duly filed financing statements pursuant to the Uniform Commercial Code (U.C.C.) which financing statement recited that a security interest was taken in, *inter alia,*

> (a) All Debtor's equipment, inventory, accounts, contract rights, and general intangibles, whether now or hereafter acquired;
>
> (b) All proceeds and all products of the property described in Paragraph (a) above..:.

On or about May 7, 1984, a construction contractor performing work on property adjacent to Bell's facility damaged Bell's underground pipelines. As a result a substantial quantity of Bell's oil was lost and its business was interrupted. Bell submitted a timely claim for loss of fuel oil, damage to pipelines, and loss of business to Royal Insurance Company of America and Globe Indemnity Company (Globe) pursuant to a business interruption insurance policy. Globe accepted the claim for loss of oil, but rejected the other claims. As a result, Bell filed Civil Action No. 85–2575 in the Eastern District of Pennsylvania in July, 1985. On January 17, 1986, Judge O'Neill concluded that Globe was required to pay for the business interruption losses that occurred as a result of the pipeline damage. However, Judge O'Neill did not determine the amount of damages for which Globe would be liable. Before this liability amount could be determined, Bell filed for bankruptcy on June 16, 1988. Bell later agreed to accept $130,000 for the loss and on September 16, 1988, the bankruptcy court approved of this settlement.

### Ruling Below

Meridian's security agreement, which was signed in February, 1985, covered all of Bell's general intangibles then owned or after acquired. Meridian's position is that Bell's action against Globe was a chose in action and, under Pennsylvania law, a chose in action is a general intangible. *See* 13 Pa.Cons.Stat. § 9106. Therefore when the chose in action settled, Meridian had a perfected security interest in the proceeds as it was a "general intangible."

The bankruptcy court rejected this rather straightforward analysis on two grounds. First, the bankruptcy court stated, "[T]he

'business interruption' loss which underlay the [Bell's] claim against the insurers here, which generated the fund, appears to be in tort." 13 Pa.Cons.Stat. § 9104(11). Second, the bankruptcy court concluded that Meridian did not have a perfected security interest in the proceeds of the settlement because the funds came from an insurance policy and were therefore excluded from Article 9 of the UCC (Secured Transactions) which excludes "a transfer of an interest or claim in or under any policy of insurance, except as provided with respect to proceeds (section 9306) and priorities in proceeds (section 9312)." 13 Pa.Cons.Stat. § 9104(7).

I conclude that Meridian did have a properly perfected security interest in the proceeds of the chose in action at issue. I will reverse the decision of the bankruptcy court.

*Discussion*

The starting point of my analysis is, of course, the statute itself. The security agreement between Meridian and Bell gave Meridian a security interest in all of Bell's general intangibles then owned or after acquired. Section 9106 defines a general intangible as, "Any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." The official comment to section 9106 states:

The term "general intangibles" brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security.... Note that this catch-all definition does not apply to money or other types of intangibles which are specifically excluded from the coverage of the Article (Section 9–104)....

Section 9104, Uniform Commercial Code provision 9–104, excludes twelve types of transactions from the scope of Article 9. Section 9104's exclusions fall generally under three main categories: first, transactions that are subject to overriding governmental interests; second, transactions that are nonconsensual; and third, transactions that are out of the mainstream of commer-

cial financing. *See* W. Hawkland, R. Lord, and C. Lewis, Uniform Commercial Code Series § 9–104:01 (1988). Section 9104(7) falls within the third category. This is evidenced by comment 7 of the 1972 comments which states:

Rights under life insurance and other policies, and deposit accounts, are often put up as collateral. Such transactions are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law. Paragraphs (g) and (1) make appropriate exclusions, but provision is made for coverage of deposit accounts and certain insurance money as proceeds.

I am persuaded that Meridian did have a properly perfected security interest in the proceeds of the chose in action. A chose in action is personal property. Black's Law Dictionary defines a chose of action as:

A thing in action and is right of bringing an action or right to recover a debt or money. Right of proceeding in a court of law to procure payment of sum of money, or right to recover a personal chattel or a sum of money by action. A personal right not reduced into possession, but recoverable by a suit at law. A right to personal things of which the owner has not the possession, but merely a right of action for their possession. The phrase includes all personal chattels which are not in possession; and all property in action which depends entirely on contracts express or implied. A right to receive or recover a debt, demand, or damages on a cause of action *ex contractu* or for a tort or omission of a duty. A right to recover by suit a personal chattel. Assignable rights of action ex contractu and perhaps ex delicto. Personalty to which the owner has a right of possession in future, or a right of immediate possession, wrongfully withheld.

Black's Law Dictionary at 219 (5th ed. 1979) (citations omitted).

 Bell had a contractual right to receive payment from Globe per the insurance contract entered into by Globe and Bell. This contractual right to receive payment qualifies as a chose in action. *See*

*Merchants National Bank of Mobile v. Ching*, 681 F.2d 1383, 1388–89 (11th Cir. 1982) (a claim for damages under breach of contract is properly categorized as a chose in action); *Gill v. United States (In re Boogie Enterprises )*, 79 B.R. 4 (C.D.Cal. 1987) (lawsuit was a general intangible covered by the financing statement even though no lawsuit had been commenced at the time the financing statement was filed); *Virginia National Bank v. Phoenix Marine Corporation (In re Phoenix Marine )*, 20 B.R. 424 (Bankr.E.D.Va.1982) (proceeds of lawsuit falls within definition of general intangible). When Globe refused to pay the claim, Bell's cause of action arose. It is unclear from the record exactly when the cause of action arose. Bell brought suit in federal court in July, 1985. Meridian's security interest arose in February, 1985. If the chose in action existed before February, 1985, it would have been covered by the language that gave Meridian a security interest in all "then existing" general intangibles. If the chose came into being after February, 1985, Meridian would still have a perfected security interest in the general intangible per the "after acquired" property clause in the security agreement.

■ Section 9104(7) excludes "a transfer of an interest or claim in or under any policy of insurance, except with respect to proceeds (section 9306) and priorities in proceeds (section 9312)." The bankruptcy court concluded that the payment of settlement funds pursuant to the chose in action was excluded from Article 9 because the underlying claim in the chose was based on the insurance contract. The bankruptcy court misreads the exclusion here. The exclusion in section 9104(7) does not apply if the transfer of an interest or claim under a policy of insurance is "with respect to proceeds." Section 9306(a) in pertinent part states:

> "Proceeds" includes *whatever is received* upon the sale, exchange, collection *or other disposition of collateral* or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds except to the extent that it is payable to a person other than a party to the security agreement.

(emphasis added). The first sentence of section 9306(a) makes clear that the settlement of the litigation, which produced $130,000.00, was proceeds of the chose in action. *See, e.g., Brown v. First National Bank of Dewey*, 617 F.2d 581 (10th Cir. 1980) (proceeds includes whatever is received when collateral or proceeds is added, exchanged, collected or otherwise disposed of; proceeds of fire insurance paid on destruction of collateral is proceeds under 9–306(a) and therefore subject to a continuously perfected security interest). The chose was the collateral, and the settlement would be the "disposition" of that collateral.

Section 9306(a) was written broadly so as to protect a secured party's collateral and give a security interest in whatever is received in exchange for collateral. The second sentence of section 9306(a) in no way limits the first sentence. Rather, the second sentence of section 9306(a) was "intended to overrule various cases to the effect that proceeds of insurance or on collateral are not proceeds of the collateral." *See* U.C.C. § 9–306, Official U.C.C. Reasons for 1972 Change. Prior to the 1972 change, some courts had interpreted the language of section 9104(7) to mean that any transfer that involved a policy of insurance, even when insurance was received as proceeds, was outside the scope of Article 9. *See* W. Hawkland, R. Lord, and C. Lewis, Uniform Commercial Code Series § 9–104:08 at 132–34. However, a number of courts did conclude that section 9104(7) was not intended to exclude insurance policy proceeds from Article 9. *See, e.g., PPG Industries, Inc. v. Hartford Fire Insurance Co.*, 531 F.2d 58, 60–61 (2d Cir. 1976) (section 9–104(g) exclusion is not triggered when insurance payoff is proceeds).

The 1972 Code change made clear that the Code framers meant to exclude from Article 9 only the transfer of life or other insurance policies themselves, and not insurance received as proceeds. The purpose of the change was also to make clear that the secured party was fully protected if the secured party had a security interest in collateral which is then converted into iden-

tifiable cash proceeds by a disposition of that collateral that results in insurance proceeds. *See* B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 1.8(7) at 1–63 (1980).

Thus, the 1972 amendments to the Code clarified the line between "original" and "derivative" insurance interest, that is, (1) a direct security interest versus, (2) an interest in insurance proceeds arising from the destruction or change in the underlying collateral. Transactions falling in the first class, such as the assignment of cash surrender value of a life insurance policy would be exempt from Article 9 under section 9104(7). Transactions falling in the second class are not the type which the drafters meant to exclude. In *PPG Industries v. Hartford Insurance Company*, 531 F.2d 58 (2d Cir.1976), the court discussed the difference between original and derivative interests in an insurance policy. The court stated:

> [I]t should be apparent that this exclusion applies only to situations where the parties to a security agreement attempt to create a direct security interest in an insurance policy by making the policy itself the immediate collateral securing the transaction. For example, § 9–104(g) would be triggered in cases where a debtor uses his life insurance policy as a means for securing a debt owed to the insurer. In contrast, there is no basis for concluding that the statutory exclusion was intended to extend to security agreements which both create a direct security interest in inventory and/or equipment and require the debtor to provide his creditor with further protection by insuring the collateral.

*PPG*, 531 F.2d at 60. *See also Nolin Production Credit Ass'n v. Stone (In re Stone)*, 52 B.R. 305 (Bankr.W.D.Ky.1985) (monies received by debtor from tortfeasor after destruction of collateral was proceeds and therefore subject to the security interest); *Virginia National Bank v. Phoenix Marine Corp. (In re Phoenix Marine)*, 20 Bankr. 424, 426 (Bankr.E.D.Va.1982) (secured party's perfected security interest in general intangibles covered a chose in ac-

tion and the secured party subsequently had a perfected security interest in the proceeds that resulted from the settlement of the suit); *Kahn v. Capital Bank*, 384 So.2d 976 (Fla.App.1980) (section 9104(7), applies to the creation of a security interest in an insurance policy itself, not insurance of collateral); *First National Bank of Highland v. Merchants Mutual Insurance Co.*, 65 A.D.2d 59, 410 N.Y.S.2d 679 (1978) (court concluded that bank had a perfected security interest in proceeds obtained for insurance on collateral).

The 1972 Code amendment made it clear that the view expressed by the Second Circuit in *PPG* as to the original/derivative insurance transfer distinction was a proper one since the definition of proceeds in section 9306(a) was changed to specifically state that insurance proceeds received on collateral were within Article 9. In *PPG* the collateral involved was inventory that was destroyed by fire with insurance proceeds paid on that collateral. Here the collateral was a chose in action (*i.e.*, the business interruption loss claim), and the proceeds were paid when the case settled. I see no reason to treat the second case differently from the first merely because a chose in action is involved in the second.

In sum, section 9104(7)'s exclusion does not apply here because the sum of $130,000 received on settlement of the chose was "proceeds" and therefore outside of section 9104(7)'s exclusion. The analysis can stop here because section 9104(7) tells us the insurance settlement is proceeds. However, it should be noted that even without the "proceeds" language in section 9104(7), the insurance received on the collateral here would still be within Article 9 because section 9104(7) itself does not apply to all forms of insurance policies. Rather, it only applies to "noncommercial" or "special" policies outside the mainstream of commercial financing. *See* Section 9104 Official Comment 7. The official comment notes that the exclusion goes to "[r]ights under life insurance and other policies," and that such special transactions are adequately

covered by existing law.[1] The business interruption insurance which is at issue here is a distinctly commercial type of insurance and one which the Code drafters undoubtedly intended to include in Article 9.

The bankruptcy court thought it proper to look at the claim underlying the chose itself. The bankruptcy court made much of the fact that the underlying litigation began when Globe insurance refused to pay Bell's claim pursuant to the insurance contract. The bankruptcy court noted that if the insurance claim was originally paid to Bell, Meridian would not now be claiming an interest in the proceeds of the litigation settlement. That observation seems irrelevant. The insurance claim was not paid and Meridian had a properly perfected security interest in the chose in action at issue. The statute permits a security interest to be taken in a chose in action, and this court is bound to give the statute its effect. The bankruptcy court's limitation of a chose in action by looking at the claim underlying the chose is unwarranted. Section 9106 defines general intangibles to include all choses in action not otherwise excluded; it is not limited to choses which are derived from certain underlying claims.

### Section 9104(11)—Tort Exception

■ The bankruptcy court also held that section 9104(11) excludes from Article 9 a transfer "in whole or part of any claim arising out of a tort." This section apparently recognizes the general common law rule that tort claims are not assignable. However, section 9104(11) simply is not applicable to this context. Bell sued Globe Insurance in federal court when Globe refused to pay under the insurance contract that protected Bell against business interruption. Bell's claim was a contract claim pure and simple. See Appeal Exhibit E, Complaint in Civil Action No. 85–2575; see also Polito v. Continental Casualty Co., 689 F.2d 457, 460 (3d Cir.1982) (court recognized that the traditional remedy for failure to pay a claim is for breach of contract). Pennsylvania law states that insurance policies are contracts to pay money. Pennsylvania courts have not followed other jurisdictions which permit tort actions for failure to pay an insurance claim. See D'Ambrosio v. Pennsylvania National Mutual Life Ins. Co., 494 Pa. 501, 431 A.2d 966 (1981), aff'g 262 Pa.Super. 331, 396 A.2d 780 (1978); see also Giovannitti v. Nationwide Insurance Co., 690 F.Supp. 1439 (W.D.Pa.1988) (tracing Pennsylvania law on insurance contract theory).

### Loss Payee Clause

■ Meridian was not named as the loss payee on the insurance contract at issue. However, since I have concluded that Meridian has a superior interest in the insurance proceeds due to its first priority perfected security interest in the chose in action, the failure of Meridian to actually have itself named as loss payee on the policy is of no moment.

### Section 9104(8)—Judgment Exception

■ The bankruptcy court mentions that section 9104(8) might possibly be relevant to the present issue. That section excludes transfers of "a right represented by a judgment (other than a judgment taken on a right to payment which was collateral)." However, the bankruptcy court apparently did not rest its decision on that ground. In any event, section 9104(8) generally applies to transfers to a third party by a holder of a right to judgment and is therefore inapplicable in this case.

### Cross Appeal

■ The Unsecured Creditor's Committee (Committee) appeals the bankruptcy court's rejection of its argument that the security agreement relates only to certain general intangibles, that is, general intangibles relating to accounts, contracts, chattel paper, instruments and documents and all other rights to the paymennt of money. The bankruptcy court properly refused to give the security agreement this strained interpretation. The security agreement was obviously intended to reach all general

---

1. As an example of one such law see 42 Pa.Cons. Stat. § 8124(c), which exempts certain insurance proceeds from attachment or execution on a judgment.

intangibles. The Committee also argues that Meridian is guilty of laches because it failed to have itself named as loss payee on the business interruption policy. This argument is without merit. It is true that Meridian could have given itself additional protection by having itself named as loss payee on the business interruption policy, but it was not required to do so. Meridian could rely on its perfected security interest without any loss payee provision. The Committee also argues that the financing statement filed by Meridian did not give Meridian the right to insurance proceeds that are not specifically proceeds of losses to secured collateral. I reject this interpretation since I have already concluded that the insurance proceeds were proceeds of the chose in action.

For the reasons stated above, I conclude that Meridian has a first priority perfected security interest in the $130,000.00, received upon settlement of the chose in action at issue, and therefore these funds will go to satisfy Meridian's security interest.

### ORDER

Upon consideration of plaintiff Meridian Bank's appeal from the decision of the bankruptcy court, intervenor Unsecured Creditors Committee's reply thereto, Bankruptcy Judge Scholl's decision below, and for the reasons stated in the accompanying memorandum, it is hereby

Ordered that the decision of the bankruptcy court is reversed, and judgment is entered in favor of Meridian Bank in its adversary proceeding in the amount of One Hundred Thirty Thousand Dollars ($130,-000.00).