In re REMCOR, INC., a/k/a Remedial Corporation, Debtor.

PREMIUM FINANCING SPECIALISTS, INC., Movant,

v.

REMCOR, INC., a/k/a Remedial Corporation, Respondent.

Bankruptcy No. 95–22204–BM.
Motion No. 95–1250M.
Related To Motion No. 95–1125M.

United States Bankruptcy Court, W.D. Pennsylvania.

Sept. 14, 1995.

Robert S. Bernstein, John B. Joyce, Bernstein and Bernstein, P.C., Pittsburgh, PA, for Remcor, Inc.

George M. Cheever, Kirkpatrick & Lockhart, L.L.P., Pittsburgh, PA, for Premium Financing Specialists, Inc.; Rodney J. Hoffman, Slagle, Bernard & Gorman, P.C., Kansas City, MO of counsel.

Neil F. Siegel, Nancy L. Heilman, Cohen & Grigsby, P.C., Pittsburgh, PA, for Sunbeam Corp.

Many Emamzadeh, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for Dollar Bank, FSB.

Frederick R. Reed, Drew T. Parobek, Vorys, Sater, Seymour & Pease, Cincinnati, OH, for ATC Environmental, Inc.

### *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

Premium Financing Specialists, Inc. (hereinafter "PFS") has brought a motion for modification of an order issued on July 5, 1995, wherein PFS was granted relief from the automatic stay to cancel certain insurance policies issued in debtor's name for

which PFS had advanced funds to pay the premiums. PFS asserts that it has a valid and enforceable first-priority security interest in the unearned insurance premiums and seeks permission to apply the refunded premiums to debtor's obligations to PFS.

Debtor, Sunbeam Corporation, which holds a perfected prepetition blanket lien against all of debtor's assets, and ATC Environmental, Inc. (hereinafter "ATC"), which holds a perfected postpetition superpriority lien against all of debtor's assets, have objected to the motion.

In accordance with the analysis set forth below, PFS' motion will be granted.

## FINDINGS OF FACT

On August 10, 1994, debtor entered into a premium finance agreement with PFS whereby PFS agreed to advance a portion of the premium due on debtor's automobile insurance policies issued by a third party. Debtor in return agreed to repay the amount advanced by PFS ($23,306.25) plus a finance charge of 7.265 percent. Payments were due in ten equal monthly installments of $2,408.93 beginning on September 12, 1994.

On March 28, 1995, debtor entered into another premium finance agreement with PFS whereby PFS agreed to advance a portion of the premiums due on various types of liability insurance issued by a third party. Debtor in return agreed to repay the amount advanced by PFS ($345,194.00) plus a finance charge of 8.65 percent.

Both agreements, which were prepared by PFS, contained identical terms and provisions. Paragraph 1, for instance, provided as follows:

The named Insured:

1. Assigns to PFS as security for the total amount payable hereunder all unearned premiums and loss payments which may become payable under the policies listed above, as to all of which insured gives PFS a security interest.

In paragraph 4 of the agreements, debtor irrevocably appointed PFS as its attorney-in-fact with full authority to cancel the policy and to receive all sums resulting therefrom.

At no time did PFS attempt to perfect its security interest in the unearned premiums in accordance with the requirements of Article 9 of the Uniform Commercial Code (hereinafter "UCC") of Pennsylvania..

On June 13, 1995, debtor filed a voluntary chapter 11 petition. In its schedules, debtor listed Dollar Bank and Sunbeam Corporation as secured creditors having blanket liens on all of debtor's assets. Their claims were scheduled at $253,000.00 and $365,000.00, respectively, with Dollar's interest taking precedence over Sunbeam's.

Along with its bankruptcy petition, debtor submitted an emergency petition to approve a management agreement and to authorize the extension of credit. Debtor sought permission to borrow up to $250,000 from ATC and to grant ATC a first position lien on all of debtor's pre- and post-petition assets. The lien was to prime the existing liens of Dollar and Sunbeam.

An order granting debtor's motion on an interim basis was issued after a hearing on June 19, 1995. Paragraph One of the decretal portion of the order provided as follows:

1. ATC shall be and hereby is authorized to extend post-petition financing to the Debtor by providing a working capital loan in one or more installments, on an as-needed basis.... This loan shall be treated as a superpriority loan with a first and best lien automatically perfected hereby on all assets of the Debtor and Debtor-in-Possession under the provisions of 11 U.S.C. Section 364(d) in favor of ATC.

A final order authorizing the extension of credit was issued on June 22, 1995, after another hearing. Paragraph Three of the decretal portion of the order provided as follows:

3. ATC shall be and hereby is authorized to extend post-petition financing to the Debtor by providing a working capital loan in one or more installments, on an as-needed basis, in the maximum aggregate amount of up to $250,000. The loan shall be repaid either from the Debtor's post-petition revenues or taken as a credit against the purchase price of the Debtor's assets by ATC. In the event that this loan

has not been repaid in full in such manner, the unpaid portion thereof shall be treated as a superpriority loan with a first and best lien automatically perfected hereby on all assets of the Debtor under the provisions of 11 U.S.C. Section 364(d) in favor of ATC.

Sunbeam appealed the above orders to the district court. They have not yet been decided.

On June 30, 1995, PFS brought a motion for relief from the automatic stay or for adequate protection. PFS alleged that it had a perfected, first priority security interest in the unearned insurance premiums and that debtor had defaulted on its obligations. It requested authorization to cancel the above insurance policies and to receive and apply the unearned premiums to the debt owed to it by debtor under the two above insurance premium finance agreements.

An order was issued after a hearing held on July 5, 1995, permitting PFS to cancel the above insurance policies and to collect the unearned insurance premiums. Because the matter was heard and decided on an emergency basis and all of the facts were not known, PFS was not permitted to apply the collected premiums towards the debt owed to it by debtor. It was directed instead to provide an accounting of the exact amount of unearned premiums for each policy of insurance and to place the amounts collected into an interest-bearing escrow account until entitlement to the funds was determined.

On July 10, 1995, PFS reported that as of July 1, 1995, it was owed approximately $316,900, excluding interest and late charges; that as of July 6, 1995, the unearned premiums under the policies totaled $285,794.60; and that application of the latter to the former would leave a deficiency claim in the amount of $31,123.30.

On July 26, 1995, PFS brought a motion to modify the order of July 5, 1995, so as to permit it to apply any and all collected unearned insurance premiums to debtor's obligation to it under the above premium finance agreements. PFS asserted that it has a valid first-priority security interest in the unearned premiums, notwithstanding its fail-ure to file financing statements or copies of the premium finance agreements in accordance with the requirements of Article 9 of the UCC. PFS maintained in its motion that Article 9 of the UCC did not apply.

Debtor, Sunbeam, and ATC have objected to the motion.

A hearing was held on August 22, 1995, on PFS' motion and the objections thereto.

## DISCUSSION

### –1–

### Does PFS Have A Perfected Security Interest In The Above Unearned Premiums?

As we have indicated, PFS insists that its interest in the unearned insurance premiums was perfected and enforceable against debtor's other creditors. It maintains that the filing of appropriate UCC–1 statements is not a prerequisite to perfection of its interest. According to PFS, all policies of insurance are excluded from the scope of Article 9 of the UCC by virtue of 13 Pa.C.S.A. § 9140(7), which provides as follows:

> This provision shall not apply: ...
>
> (7) to transfer of an interest or claim in any policy of insurance, except as provided with respect to proceeds (section 9306) and priorities in proceeds (section 9312).

13 Pa.C.S.A. § 9140(7) (Purdon's 1984).

The controlling law, PFS continues, is set forth at § 3312 of Pennsylvania's Insurance Premium Finance Company Act (hereinafter "Insurance Act"), which provides as follows:

> No filing of the insurance premium finance agreement shall be necessary to perfect the validity of such agreement as a secured transaction as against creditors, subsequent purchasers, pledgees, encumbrancers, successors or assigns.

40 P.S. § 3312 (Purdon's 1992).

Debtor and Sunbeam deny that PFS' security interest was duly perfected and insist that its interest is subordinate to the interest of all other prepetition secured creditors who filed appropriate UCC–1 financing statements. They argue that the exclusion set forth at 13 Pa.C.S.A. § 9104(7) applies **only**

to life insurance policies. All other policies of insurance, especially commercial policies insuring against liability, fall within the scope of Article 9 of the UCC.

Debtor further objects to PFS' reliance upon 40 P.S. § 3312. It denies that PFS "falls under the Insurance Premium Financing Act".

We shall address these objections by debtor and Sunbeam to determine whether they have merit.

### (A) *Does Article 9 Of The UCC Apply?*

 PFS relies primarily upon what it characterizes as the "crystal clear" language of § 9–104(7). With certain exceptions not relevant here, it argues, § 9104(7) unambiguously states that Article 9 of the UCC does not apply to the transfer of an interest in "**any** policy of insurance".

Debtor and Sunbeam respond that no reported decision construing § 9–104(7) as enacted in Pennsylvania has read it as excluding all policies of insurance from the scope of Article 9. To the contrary, they contend, the leading cases *Ettinger v. Central Penn National Bank*, 2 B.R. 385 (E.D.Pa.1979), *reversed on other grounds*, 634 F.2d 120 (3d Cir.1980) and *In re Bell Fuel Corporation*, 99 B.R. 602 (E.D.Pa.), *aff'd*, 891 F.2d 281 (3d Cir.1989), hold that only noncommercial life insurance policies are excluded from the scope of Article 9 of the UCC.

Reliance upon *Ettinger* is misplaced.

To begin with, the issue decided there is altogether different from the issue before us in this case. The issue in *Ettinger* was:

> ... whether monies received by the beneficiary of a fire insurance policy for damage to personal property, which was pledged as collateral under a security agreement and recorded in a financing statement, constitute "proceeds" within the meaning of § 9–306 of the Uniform Commercial Code (1964 version) ("UCC") as adopted by the Pennsylvania legislature.

*Ettinger*, 2 B.R. at 387. The court ultimately determined that the monies in question were "proceeds" within the meaning of § 9–306. *Ettinger*, 2 B.R. at 392.

In response to an assertion by a litigant that § 9–104(7) prohibits all insurance proceeds from being the proper subject of a security interest, 2 B.R. at 392, the *Ettinger* court commented that § 9–104(7) prohibited creation of a perfected security interest **only** in life insurance policies:

> It is quite clear ... that § 9104(g) was not intended to be a general prohibition against security interests in all types of insurance but only life insurance policies.

*Ettinger*, 2 B.R. at 393.

Even if the reasoning in *Ettinger* in support of this conclusion were irrefragable, it provides no guidance for determining whether the above assertion by debtor and Sunbeam is defensible. Debtor and Sunbeam do not contend that § 9–104(7) **prohibits** creation of a security interest in a life insurance policy. They instead merely maintain that § 9–104(7) **excludes** only life insurance policies from the scope of Article 9 of the UCC. It is their position that every other type of insurance policy, including the types at issue here, is subject to the requirements of Article 9 of the UCC.

The primary issue in *Bell Fuel* was whether funds a debtor had received from an insurer in settlement of a lawsuit based on a business interruption insurance policy constituted "proceeds" for purposes of the exception set forth at § 9–104(7).

The bankruptcy court had determined that the funds were not "proceeds"; that the proceeds exception to § 9–104(7) therefore did not apply to the funds; and that Article 9 of the UCC did not apply when determining whether a creditor had a duly perfected security interest in the funds. See *In re Bell Fuel*, 97 B.R. 193, 197–98 (Bankr.E.D.Pa. 1989).

The district court reversed the decision of the bankruptcy court. It held that the funds were "proceeds"; that the exception for proceeds set forth in § 9–104(7) therefore applied; and that Article 9 of the UCC therefore applied:

> In sum, section 9104(7)'s exclusion does not apply because the sum of $130,000 received

in settlement was "proceeds" and therefore outside of section 9104(7)'s exclusion.

*Bell Fuel,* 99 B.R. at 607.

Immediately after arriving at the above conclusion, the district court continued as follows:

> The analysis can stop here because section 9104(7) tells us the insurance settlement is proceeds. However, it should be noted that even without the "proceeds" language in section 9104(7), the insurance received on the collateral would still be within Article 9 because section 9104(7) itself does not apply to all forms of insurance policies. Rather, it only applies to "noncommercial" or "special" policies outside the mainstream of commercial financing. See Section 9104 Official Comment 7.... The business interruption insurance which is at issue here is a distinctly commercial type of insurance and one which the Code drafters undoubtedly intended to include in Article 9.

*Bell Fuel,* 99 B.R. at 607–08.

Reliance upon *Bell Fuel* also is misplaced for a variety of reasons.

In the first place, the issue in *Bell Fuel* was significantly different from the issue now before us. There the court had to decide whether certain funds fell within the "proceeds" exception to the exclusion set forth at § 9–104(7). Here we must determine whether Article 9 of the UCC applies to unearned premiums for commercial liability insurance policies. The "proceeds" exception to the exclusion set forth at § 9–104(7) is not at issue in this case.

Also, the above remark in *Bell Fuel* that § 9–104(7) does not exclude all types of insurance policies from the scope of Article 9 of the UCC but excludes only "noncommercial" or "special" policies of insurance is *dictum.* The court already had determined that the funds in question were "proceeds" for purposes of § 9–104(7). The statement played no part in deciding the case.

Finally, even if the assertion is not *dictum,* we are convinced that it is incorrect. The statement that § 9–104(7) excludes from Article 9 only "commercial" or "special" policies of insurance does not square with the unambiguous language of § 9–104(7), which speaks of "**any** policy of insurance". The language is universal in its scope and does not speak of only a limited subset of insurance policies.

Official Comment 7 to § 9–104(7), upon which the above statement in *Bell Fuel* relies, reads as follows:

> 7. Rights under life insurance and other policies and deposit accounts are often put up as collateral. Such transactions are often quite special, do not fit easily under a general statute, and are adequately covered by existing law. Paragraphs (g) and (*l*) [i.e., (7) and (13)] make appropriate exclusions, but provision is made for coverage of deposit accounts and certain insurance money as proceeds.

In our estimation, this comment does not support the inference that Article 9 of the UCC does not apply only to "noncommercial" or "special" policies of insurance but does apply to all other types of policies. As we understand this comment, it speaks of life insurance "and other policies" and states only that they often are "quite special", do not "fit easily" under a general commercial statute such as the UCC., and are "adequately covered" by existing law. The proposition that § 9–104(7) excludes only certain types of insurance policies from Article 9 rather than all types in not supported by Official Comment 7 to § 9–104.

As far as we have been able to determine, there are no binding reported decisions either by the Pennsylvania Supreme Court or by the United States Court of Appeals for the Third Circuit on the precise issue now before us.[1] Considering the unambiguous language of § 9–104(7), the only reasonable interpretation of it is that, except for proceeds and priorities to proceeds, Article 9 of

---

**1.** Affirmance of *Bell Fuel* by the Third Circuit does not determine the answer to the question now before use. As we noted, the issue in *Bell Fuel* was decidedly different from the present issue. Because the decision by the Third Circuit was not published, we have no way of knowing what issues were appealed or what principles were relied upon by the Third Circuit in deciding the appeal.

the UCC does not apply to the transfer of an interest in **any** policy of insurance.

It is highly significant that most (if not all) reported decisions from other jurisdictions that have construed § 9–104(7), as enacted in other states, in deciding the issue now before us have held that perfection of a security interest in unearned insurance premiums is determined without reference to Article 9 of the UCC. *See In re Watts,* 132 B.R. 31 (Bankr.W.D.Mo.1991) (applying Missouri law); *A–1 Credit Corporation v. Big Squaw Mountain Corp. (In re Big Squaw Mountain Corp.),* 122 B.R. 831 (Bankr.D.Me.1990) (applying Maine law); *In re Cooper,* 104 B.R. 774 (Bankr.S.D.W.Va.1989) (applying West Virginia law); *Uly–Pak, Inc. v. Consolidated Insurance Agency, Inc., (In re Uly–Pak, Inc.),* 101 B.R. 551 (Bankr.S.D.Ill.1989) (applying Illinois law); *In re Expressco, Inc.,* 99 B.R. 395 (Bankr.M.D.Tenn.1989) (applying North Carolina law); *In re Universal Motor Express, Inc.,* 72 B.R. 208 (Bankr.W.D.N.C. 1987) (applying North Carolina law); *TIFCO v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.),* 67 B.R. 990 (Bankr. D.Conn.1986); *Borg–Warner Credit Corp. v. RBS Industries, Inc, (In re RBS Industries, Inc.),* 67 B.R. 946 (Bankr.D.Conn.1986) (applying New York law); *Comerica Bank–Ann Arbor, N.A. v. Sutherland (In re Duke Roofing Co.),* 47 B.R. 990 (E.D.Mich.1985) (applying Michigan law); *In re Air Vermont, Inc.,* 40 B.R. 335 (Bankr.D.VT.1984) (applying Massachusetts and Vermont law); *Premium Financing Specialists, Inc. v. Lindsey,* 11 B.R. 135 (E.D.Ark.1981) (applying Arkansas law); *Drabkin v. A.I. Credit Corp. (In re Auto–Train Corp.),* 9 B.R. 159 (Bankr.D.D.C. 1981) (applying District of Columbia law); *Feinstein v. AFCO Credit Corp. (In re Krimbel Trucking Co.),* 3 B.R. 4 (Bankr. W.D.Wash.1979) (applying Washington law); *Thico Plan, Inc. v. Maplewood Poultry Co. (In re Maplewood Poultry Co.),* 2 B.R. 550 (Bankr.D.Me.1980) (applying New Jersey law); *Nicola v. Northfield Insurance Co. (Matter of Redfeather Fast Freight, Inc.),* 1 B.R. 446 (Bankr.D.Neb.1979).

█ Debtor and Sunbeam have cited to no reported authority from any jurisdiction that holds to the contrary with respect to un-

earned insurance premiums. This, we are convinced, indicates that there is no authority from any jurisdiction for the position they assert in this proceeding. Were we to side with debtor and Sunbeam and limit § 9–104(7) in a way that makes unearned insurance premiums subject to Article 9 of the UCC, our decision would be *hapax legomenon.* So holding would contravene the express policy of making the law pertaining to the UCC uniform among the jurisdictions that have adopted it. *See* 13 Pa.C.S.A. § 1102(b)(3) (Purdon's 1984). Such uniformity must be accorded great weight when ascertaining whether or not a transaction should be excluded from the scope of Article 9. *See In re Bristol Associates, Inc.,* 505 F.2d 1056, 1064 (3d Cir.1974).

**(B)** *Must PFS File Something To Perfect Its Interest?*

█ The determination that the provisions and requirements of Article 9 of the UCC do not apply here does not end our inquiry. We still must determine whether PFS' failure to file anything at all is fatal to assertion of PFS' interest against debtor's other creditors.

It is beyond gainsay that Pennsylvania law provides the answer to this question. As we have noted, Pennsylvania's Insurance Premium Finance Company Act (40 P.S. § 3312) provides that PFS did not have to do anything further to perfect its security interest.

Debtor has objected, probably half-heartedly, to the applicability of the Insurance Act in deciding this issue. As we previously indicated, debtor denies that PFS "falls under the Insurance Premium Financing Act". Debtor baldly avers that PFS has failed to establish that it met the licensing requirements set forth at 40 P.S. § 3303; has failed to establish that the premium finance agreements at issue here were approved by the Insurance Commissioner of Pennsylvania, as required by 40 P.S. § 3307; and has failed to establish that the interest rates charged in the agreements comply with the requirements set forth at 40 P.S., § 3308.

Although debtor does not come out and say so, it obviously wants us to declare that

PFS' secured interest is not perfected because it has failed to establish compliance with the above requirements. We need not consider the specific provisions cited by debtor to know that its objection is without merit.

Even if we assume for the sake of argument that PFS has willfully and knowingly violated the above Insurance Act, it does not follow that its secured interest in the unearned premiums therefore is unperfected. The Insurance Act specifically provides the following penalties for violations thereof:

(a) **Violation of act.** Any insurance premium finance company or insurer, agent or broker who willfully and knowingly violates this act commits a misdemeanor of the third degree.

(b) **Unlicensed business.** Any person who engages in the business of entering into insurance premium finance agreements without having a valid license under this act commits a misdemeanor of the third degree.

40 P.S. § 3313 (Purdon's 1992).

Debtor in effect is asking us to penalize PFS for allegedly violating the above requirements of the Insurance Act by declaring that its security interest in the unearned premiums is not perfected as against debtor's creditors.

Section 3313 of the Act does not provide for such a penalty. In our estimation, such a penalty is not necessary for effectuating the Act. Accordingly, we could not so penalize PFS even if it has violated the Insurance Act. *See* 1 Pa.C.S.A. § 1504 (Purdon's Supp. 1995).[2]

–II–

**Is PFS' Interest Subordinate To The Interest Of ATC?**

■ Sunbeam and ATC also object that even if PFS has a perfected security interest in the above unpaid insurance premiums, its interest nonetheless is subordinate to ATC's perfected superpriority postpetition lien in all of debtor's assets. Accordingly, they argue, PFS should not be permitted to apply the unearned premiums to the debt owed to it by debtor.

This contention is without merit. PFS' prepetition lien is not subordinate to ATC's superpriority postpetition lien because the latter does not attach to the unearned insurance premiums.

The orders of June 19, 1995, and June 22, 1995, granted ATC a perfected superpriority postpetition lien "on all assets of the Debtor under the provisions of 11 U.S.C. Section 364(d)", which provides as follows:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. . . .

By its express terms, the lien so granted must be "on property of the estate that is subject to a lien". The reason why ATC's postpetition superpriority lien did not attach to the unearned insurance premiums is that they were not "property of the estate".

As was indicated previously, debtor **assigned** all unearned insurance premiums to PFS as security for the debt owed to PFS by debtor.

The United States Court of Appeals for the Third Circuit has held that a life insurance policy that a debtor had absolutely assigned to a creditor prior to filing for bankruptcy as security for a loan was not "property of the estate". *See Estate of Lellock v. Prudential Insurance Company of America*, 811 F.2d 186, 190 (3d Cir.1987). It also has held that rents collected by a mortgagee

---

2. 1 Pa.S.C.A. § 1504 (Purdon's Supp.1995) provides as follows:

In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the stat-

ute shall be strictly pursued and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect.

pursuant to an assignment-of-rents clause in a mortgage were not "property of the estate". *See Commerce Bank v. Mountain View Village,* 5 F.3d 34, 38 (3d Cir.1993). The circumstances of this case compel a similar conclusion with respect to the unearned insurance premiums debtor assigned to PFS as security for the debt owed to PFS.

Under Pennsylvania law, an assignment is:

... a transfer or setting over of property, or of some right therein, from one person to another, and unless in some way qualified, it is properly the transfer of the whole interest in an estate, chattel, or other thing.

*In re Purman's Estate,* 358 Pa. 187, 56 A.2d 86, 88 (1948).

 The assignee of rights arising under an insurance policy that are assigned as collateral to secure payment of a debt has a qualified interest in the assigned chose that is commensurate with the debt so secured. *See Seip v. Laubach,* 333 Pa. 225, 4 A.2d 149, 151 (1939); *also General Life Insurance Company v. Sutch,* 31 F.Supp. 192 (W.D.Pa. 1939). The assignee occupies the position of the assignor and becomes the owner of those rights. *See Snyder, To Use of Cochran v. Home Life Insurance Company of America,* 328 Pa. 424, 195 A. 895, 896 (1938). The assignee's interest in the rights is enforceable against the assignor and creditors or anyone else claiming under them. *See Musselman v. Sharswood Building & Loan Association,* 323 Pa. 550, 187 A. 419, 421 (1936).

Because the debt owed to PFS by debtor had not been paid when debtor filed it petition, PFS was the owner of the unearned insurance premiums at that time by virtue of the above assignments. Debtor had no interest in the unearned premiums at that time. It follows that the unearned premiums were not part of the bankruptcy estate and that ATC's postpetition superpriority lien therefore did not attach to the unearned premiums. Accordingly, PFS' lien against the unearned premiums is not subordinate to ATC's superpriority lien.

An appropriate order shall be issued.

*ORDER OF COURT*

AND NOW at Pittsburgh this 14th day of September, 1995, in accordance with the accompanying Memorandum Opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** that the motion of Premium Financing Specialists, Inc. at Motion No. 95–1250M is **GRANTED.**

IT FURTHER IS **ORDERED, ADJUDGED** and **DECREED** that the order entered on July 5, 1995 at Motion No. 95–1125M is modified so as to permit Premium Financing Specialists, Inc. to apply to the obligations of debtor under the premium finance agreements dated August 10, 1994, and March 28, 1995, all unearned premiums payable pursuant to the underlying insurance policies.

IT IS SO **ORDERED.**